**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------ X
RAJNARIND KAUR,                                            :
                                                           :
                            Plaintiff,          :          Civil Action No.:
                                                           :
            v.                                  :          **COMPLAINT**
                                                           :
DEUTSCHE BANK A.G. and SANDRO BOERI, :                      <u>**Jury Trial Demanded**</u>
in his individual and professional capacities,  :
                                                           :
                            Defendants.         :
------------------------------------------------------------ X

      Plaintiff Rajnarind Kaur hereby alleges against Defendants Deutsche Bank A.G.

("Deutsche Bank" or the "Bank") and Sandro Boeri (together, "Defendants") as follows:

<u>**PRELIMINARY STATEMENT**</u>

      1.     Plaintiff Rajnarind Kaur is an Indian, Sikh woman who worked at Defendant

Deutsche Bank A.G. in various roles and departments from June 2010 through November 2018,

with positive performance reviews throughout.  In April 2017, Ms. Kaur informed her newly-

appointed supervisor in the Group Audit department, Defendant Sandro Boeri, that she was

suffering from a serious brain tumor, for which she would later be required to undergo a major

operation that would require extensive medical leave.  Rather than offering words of support or

concern in response to Ms. Kaur's disclosure, Mr. Boeri took the opportunity to send a clear

message that he did not want to "deal with" an employee with medical issues.  To that end, Mr.

Boeri began baselessly painting Ms. Kaur as a "mismatch" for Group Audit and, upon her return

from leave, denied her any meaningful opportunity to advance.  Directly following Ms. Kaur's

multiple complaints of discrimination to Mr. Boeri and to Human Resources ("HR") — in

response to which no remedial action was ever taken — Ms. Kaur was abruptly fired without any

advance notice, after eight years of employment.

2.      Ms. Kaur seeks declaratory, injunctive and equitable relief, as well as monetary damages, to redress Defendants' unlawful employment practices, including unlawful discrimination and retaliation in violation of the Family and Medical Leave Act, 29 U.S.C. §§ 2601 *et seq*. ("FMLA"), the New York State Human Rights Law, N.Y. Executive Law §§ 290 *et seq*. ("NYSHRL"), and the New York City Human Rights Law, N.Y. City Administrative Code §§ 8-101 *et seq*. ("NYCHRL").

## JURISDICTION AND VENUE

3.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 as this action involves federal questions regarding the deprivation of Plaintiff's rights under the FMLA. The Court has supplemental jurisdiction over Plaintiff's related claims arising under state law pursuant to 28 U.S.C. § 1367(a).

4.      Pursuant to 28 U.S.C. § 1391, venue is proper in this district because a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this district.

## ADMINISTRATIVE PROCEDURES

5.      Plaintiff will also file a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC").  Following the EEOC's issuance of a Notice of Right to Sue, Ms. Kaur will seek leave of the Court to further amend the Complaint to add claims under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e *et seq*.

6.      Any and all other prerequisites to the filing of this suit have been met.

## PARTIES

7.      Plaintiff Rajnarind Kaur is an Indian, Sikh woman and is a former employee of Deutsche Bank.   Plaintiff currently resides in Monroe, New Jersey.  At all relevant times,

Plaintiff met the definition of "employee" and/or "eligible employee" under all applicable statutes.

8.      Defendant Deutsche Bank is a Delaware limited liability company with its principal place of business located at 60 Wall Street, New York NY 10005.  At all relevant times, Deutsche Bank met the definition of an "employer" and/or a "covered employer" under all relevant statutes.

9.      Defendant Sandro Boeri is Head of Staff Development Internal Audit in Deutsche Bank's London, England office and resides in England.  Mr. Boeri directly supervised Plaintiff from January 2017 until her termination and directly participated in the discriminatory and retaliatory conduct to which Plaintiff was subjected.  At all relevant times, Mr. Boeri met the definition of an "employer" and/or a "covered employer" under all relevant statutes.

## FACTUAL ALLEGATIONS

### Ms. Kaur's Employment at Deutsche Bank and Transition to Group Audit

10.     In June 2010, Ms. Kaur joined Deutsche Bank as a consultant while she was enrolled in the Executive M.B.A. program at New York University's Stern School of Business.

11.     In early 2011, Ms. Kaur began working at Deutsche Bank as a full-time employee.

12.     Until approximately April 2016, Ms. Kaur worked as a Program Manager for various departments, where she was given increased responsibilities and developed valuable and transferrable skills in areas including, among other things, training employees, managing projects and individuals who managed projects, and managing marketing and communications within the Bank's various departments.

13.     Ms. Kaur's mobility across the Bank's various departments required recommendations and approval from her respective managers and was indicative of her outstanding reputation and reliability.

14.     Indeed, as a Program Manager, Ms. Kaur consistently received favorable performance reviews and praise for her work ethic and integrity.

15.     By way of example only, in a year-end review, Ms. Kaur's former manager, Marc McKenzie wrote,

> "It has been a pleasure to work with Raj and her duties and responsibilities over the course of the last year are closer aligned to a Director than a Vice President.  She has shown that she is pragmatic, innovative and focused and can be trusted to be a champion of the organization's values and beliefs at every opportunity.  She is a high caliber employee and reflects the values of DB a[s] much as any employee I have ever met."

16.     In April 2016, after a structural reorganization, Ms. Kaur was transferred to the Group Audit department.

17.     Although Ms. Kaur was not a Certified Public Accountant and did not have audit experience, the American Regional Head of Group Audit, Ian Overton, was actively recruiting individuals to join Group Audit, regardless of their background or experience.

18.     To that end, Mr. Overton and Ms. Kaur's managers in Group Audit understood that there would be a "ramping up" period necessary for Ms. Kaur to familiarize herself with audit-related topics.

19.     Upon transitioning to Group Audit, Ms. Kaur initially reported to Helge Lautenbach, who was located in Frankfurt, Germany.  In approximately July 2016, Ms. Kaur began reporting to Sissel Heiberg, who was located in London, England.

20.     At all times, Mr. Overton and Ms. Kaur's supervisors within Group Audit knew that Ms. Kaur did not possess a background in audit, and Ms. Kaur's familiarity or proficiency in audit-related topics and areas was never a prerequisite to her working in Group Audit.

21.     Despite her lack of audit experience or background, Ms. Kaur excelled in Group Audit and received positive feedback regarding her contributions and performance, as well as her progress in "ramping up" her audit knowledge.

22.     By way of example only, Ms. Kaur's initial overall manager in Group Audit, Mr. Lautenbach, submitted an Additional Manager Performance Review in conjunction with Ms. Kaur's 2016 year-end performance review in which he wrote that Ms. Kaur "quickly buil[t] her knowledge o[f] [Group Audit's] methodology [and] buil[t] a very good rapport with US senior management."  Mr. Lautenbach further noted that Ms. Kaur received "[v]ery good feedback" from regional Group Audit senior management.

23.     Likewise, Ms. Kaur's initial local manager, Martin Esters, also submitted an Additional Manager Performance Review in conjunction with Ms. Kaur's 2016 year-end performance review in which Mr. Esters wrote,

> "In light of the fact that she only joined Group Audit seven months ago, Raj has done a good job in developing her knowledge and understanding of the methodology and organization.  Raj has shown a high level of dedication to her work, and has a very good rapport with the NY audit staff."

24.     Mr. Esters further wrote that Ms. Kaur,

> "made a lot of significant contributions during her relatively short tenure with Group Audit, and I am hopeful that these contributions will continue as her knowledge and understanding of Group Audit continues to increase."

25.     Ms. Kaur's subsequent overall manager, Ms. Heiberg, observed in Ms. Kaur's 2016 year-end review that even though Ms. Kaur did not "have an audit background," she had "Very Good Performance" for her first year in Group Audit.

26.     In addition, Ms. Kaur's peers and direct reports submitted 360 Performance Feedback reviews in conjunction with Ms. Kaur's 2016 year-end review in which they provided glowing feedback, including the following:

- "She is a true asset to Group Audit and the firm."

- "Although new to audit, Raj has developed rapidly.  She is able to deliver training clearly and answer auditor questions logically."

- "Raj appears to have adapted well to audit and has seemed to quickly become deeply knowledgeable in audit practices and processes."

- "Since joining Group Audit, Raj has infused the US region with her 'can do' positive and pragmatic approach.  She greatly helped the management team design and execute the top initiatives requested by the US regional head of group audit. . . .  Feedback from new team members who attend new hire training has also been extremely positive."

- "As Raj is not an auditor by profession, she should continue to learn more about audit and GA methodology. This is something that Raj already does, as is evidenced by her success in training new experienced auditors."

27.     In January 2017, Sandro Boeri joined Deutsche Bank as Head of Staff Development Internal Audit and replaced Ms. Heiberg as Ms. Kaur's direct manager.

**Ms. Kaur Discloses a Serious Medical Condition to Mr. Boeri**

28.     In April 2017, Ms. Kaur disclosed to Mr. Boeri that she was suffering from a serious medical condition; namely, a brain tumor and would require medical treatment.  Mr. Boeri clearly perceived Ms. Kaur as suffering from a disability.

29.     Mr. Boeri, apparently upset about having to "deal with" an employee with medical concerns, began subjecting Ms. Kaur to excessive and unnecessary disciplinary measures, holding her performance to an unreasonable standard, and failing to provide the resources necessary to succeed in her job.

30.     Perhaps most egregious, in Ms. Kaur's 2017 mid-year review, in direct contrast to the consistent praise that Ms. Kaur had received regarding her performance and ability to adapt, Mr. Boeri baselessly painted Ms. Kaur as a "mismatch" for Group Audit and began laying the groundwork for her ultimate termination.

31.     Specifically, on July 7, 2017, during the course of a verbal mid-year review, while Mr. Boeri noted that he was impressed with Ms. Kaur's engagement and her ability to present to the Group Audit team, he stated that there was a "knowledge gap" stemming from Ms. Kaur's lack of audit experience and background.

32.     Mr. Boeri informed Ms. Kaur that it would be in her best interest to begin looking for new positions internally at the Bank.

33.     In response, Ms. Kaur reminded Mr. Boeri of her medical condition and stated, "You know my situation.  I am not going anywhere."  Mr. Boeri did not offer any meaningful response.

34.     Contrary to Mr. Boeri's statement that Ms. Kaur was a "mismatch" for Group Audit, Ms. Kaur consistently received positive feedback upon her transition to Group Audit and Mr. Boeri understood that Ms. Kaur did not have a formal background or experience in audit.  To that end, as discussed above, Ms. Kaur's managers in Group Audit understood and expected that Ms. Kaur would require time to familiarize herself with audit-related topics.

35.     Moreover, to the extent that Ms. Kaur's lack of audit background rendered her a "mismatch" for Group Audit, Mr. Boeri repeatedly denied Ms. Kaur's requests to advance and improve upon her audit skills, effectively ensuring Ms. Kaur's inability to succeed in Group Audit.

36.     On approximately July 18, 2017, Ms. Kaur informed Mr. Boeri that she would be undergoing a major operation to remove her brain tumor and would be on medical leave for an extended period of time thereafter.

37.     Mr. Boeri did not offer Ms. Kaur any well wishes or other encouraging remarks.

38.     To the contrary, at the end of July 2017, Mr. Boeri completed a written performance review memorializing Ms. Kaur's verbal review in which he removed any reference to Ms. Kaur's success in engaging with and presenting to the Group Audit team, but again noted that Ms. Kaur was allegedly a "mismatch" for Group Audit.

39.     Mr. Boeri again recommended that Ms. Kaur be transitioned out of Group Audit.

40.     On or about July 24, 2017, Ms. Kaur requested a medical leave pursuant to the FMLA to undergo a brain operation to remove her tumor.

41.     On July 31, 2017, Ms. Kaur underwent a successful brain operation.

42.     Thereafter, Ms. Kaur remained on medical leave until January 29, 2018.

43.     While Ms. Kaur was on medical leave, her doctors provided the Bank with intermittent reports concerning her condition, progress and continuing need to remain on leave.

44.     Notably, as Ms. Kaur was on leave until January 29, 2018, Mr. Boeri never provided Ms. Kaur with a year-end review for 2017.  Therefore, Ms. Kaur was unable to establish definitive objectives for 2018, which resulted in additional lack of clarity in her role and expectations.

45.     Upon Ms. Kaur's return from medical leave, consistent with past conduct, Mr. Boeri offered no words of welcome and did not inquire about the status of Ms. Kaur's health.

46.     To the contrary, although Ms. Kaur returned to work on January 29, 2018, she only had minimal email communication with Mr. Boeri until February 13, 2018, when Mr. Boeri scheduled a video conference with Ms. Kaur and Mr. Overton.

47.     As Ms. Kaur was returning from a nearly six-month medical leave, she believed that the purpose of this conference was merely to touch base and generally catch up.

48.     To Ms. Kaur's surprise, Mr. Boeri began the February 13, 2018 conference by stating, "Let's pick up from the mid-year review."  This was the first time that Ms. Kaur and Mr. Boeri were speaking since she returned from medical leave, and Ms. Kaur stated that she was obviously not expecting or prepared to discuss her mid-year review at that time.

49.     Mr. Overton was similarly surprised and noted his disbelief that Ms. Kaur and Mr. Boeri had not spoken since Ms. Kaur's return from medical leave.

50.     Ms. Kaur observed that Mr. Boeri had, once again, not asked her how she was doing or inquired about her health and proceeded to state the obvious to Mr. Boeri:  "I get it, you don't like me."

51.     Although Mr. Boeri attempted to ignore Ms. Kaur's comment and did not offer a meaningful response, Mr. Overton stopped the conversation and asked Mr. Boeri to respond to Ms. Kaur's assertion that Mr. Boeri did not like her.

52.     Mr. Boeri told Mr. Overton and Ms. Kaur, "It's not a matter of 'like,' we just need to get work done," implying that Mr. Boeri had a problem with Ms. Kaur's medical leave, and that her absence from the Bank was an impediment to getting work done.

53.     The meeting proceeded with Mr. Boeri again telling Ms. Kaur that she was not a "good fit" in Group Audit, that she did not have the requisite audit experience or background and that she should plan on being transitioned out of Group Audit in the coming months.

54.     When Ms. Kaur asked whether her position was being eliminated, Mr. Overton stated that it was not.

55.     The February 13, 2018 meeting ended with Ms. Kaur requesting that Mr. Boeri provide her with a documented description of her job so that she could conduct a "gap analysis" and identify opportunities where she could further develop her audit skills and close any purported knowledge gap.

56.     At the conclusion of the February 13, 2018 meeting, Mr. Overton urged Ms. Kaur to contact the Bank's Human Resources ("HR") department to discuss her next steps.  However, when Ms. Kaur ultimately spoke with Silvana Stoltz in HR, Ms. Stoltz appeared to be unaware of the discussion at the February 13, 2018 meeting or any purported "knowledge gap" that Mr. Boeri had cited or than Mr. Overton urged her to speak to HR about.

57.     On February 14, 2018, Ms. Kaur again requested that Mr. Boeri send her the original job description for her position and reiterated that she was "ready and willing to contribute to the [Staff Development] workload."

58.     On February 21, 2018, Ms. Kaur renewed her request for her original job description from Mr. Boeri, but Mr. Boeri again failed to respond.

59.     Likewise, as her requests for a job description from Mr. Boeri had gone ignored, Ms. Kaur requested that HR provide her with a job description in order to rectify any supposed deficiencies in her performance, but HR similarly ignored Ms. Kaur's requests.

**Mr. Boeri Denies Ms. Kaur of the Resources and Opportunities Necessary to Succeed**

60.     Upon Ms. Kaur's return from medical leave, Mr. Boeri did not merely fail to provide Ms. Kaur with a job description so that Ms. Kaur could conduct a "gap analysis" and rectify any deficiencies in her performance.

61.     Rather, Mr. Boeri repeatedly demonstrated his intention to force Ms. Kaur out of Group Audit by both significantly cutting her responsibilities and deliverables and denying her requests to familiarize herself with audit topics in order to rectify any purported "mismatch" or "knowledge gap."

62.     Specifically, upon returning from medical leave, Ms. Kaur's only two deliverables included:  (i) revamping the contents of a two-hour global training program for new hires; and (ii) attending one-on-one training sessions with Mr. Boeri whereat Mr. Boeri allegedly sought to catch Ms. Kaur up on developments in Group Audit and walk Ms. Kaur through any relevant changes that had occurred during her medical leave.

63.     Prior to going on leave, Ms. Kaur's responsibilities were far more substantial and included, *inter alia*, planning and conducting a five-day induction training program, conducting additional training programs and regularly looking for content refreshers to present to the trainees and collaboratively working with other team members to provide training programs to individuals within Group Audit.

64.     Upon her return from medical leave, Ms. Kaur was stripped of substantial responsibilities and accountability, which resulted in marginalization and creation of the appearance that Ms. Kaur was not a contributing member of the Group Audit team.

65.     As Mr. Boeri had noted in their February 13, 2018 meeting that he was only interested in "getting work done," this reduction in Ms. Kaur's deliverables and responsibilities

demonstrated that Mr. Boeri viewed Ms. Kaur's medical condition as an impediment to achieving these goals.

66.     Moreover, as any developments in Group Audit were minor and could have easily been learned by Ms. Kaur on her own, Mr. Boeri clearly sought to prevent Ms. Kaur from performing her duties for Group Audit and ultimately rid himself of a disabled employee who had taken medical leave or who may be required and entitled to take medical leave in the future.

67.     To that end, shortly after returning from medical leave, Ms. Kaur requested a meeting with Group Audit Regulatory Trainer Jennifer Wilson in order to catch up with anything she had missed while out on leave.

68.     When Ms. Kaur met with Ms. Wilson, Ms. Wilson appeared to be unwilling to assist Ms. Kaur in getting caught up to speed.

69.     Ms. Wilson subsequently informed Ms. Kaur that Mr. Boeri had instructed her to not provide Ms. Kaur with meaningful information or assistance, thereby inhibiting Ms. Kaur from effectively performing her job functions in Group Audit and further marginalizing her from the rest of her team.

70.     When Ms. Kaur confronted Mr. Boeri about his instruction that Ms. Wilson not assist Ms. Kaur, Mr. Boeri acknowledged that he instructed Ms. Wilson to not provide Ms. Kaur with meaningful assistance.  Mr. Boeri inexplicably claimed that he wished to meet with Ms. Kaur before Ms. Wilson met with her upon her return from leave.

71.     Mr. Boeri's conduct sent the message that disabled employees who took medical leave would be punished by being stripped of their responsibilities at the Bank and by being denied the opportunity and/or resources to succeed.

72.     Moreover, although Ms. Kaur actively sought opportunities to familiarize herself with audit-related topics in order to catch up and bridge any purported "knowledge gap," Mr. Boeri routinely denied her of any such opportunity, and, in fact, subjected Ms. Kaur to discipline when she attempted to do so.

73.     By way of example, whereas Ms. Kaur repeatedly requested permission to take relevant courses to familiarize herself with audit topics, Mr. Boeri only ultimately reluctantly agreed to allow Ms. Kaur to take a single course.

74.     Likewise, although Ms. Kaur repeatedly requested Mr. Boeri's permission to take the Certified Internal Auditor certification exam, Mr. Boeri denied each such request and Mr. Kaur never had the opportunity to take the exam.

75.     Furthermore, after Ms. Kaur took the initiative to shadow an auditor through the course of an audit in an effort to familiarize herself with the audit process, rather than commending Ms. Kaur's proactivity, Mr. Boeri reprimanded Ms. Kaur for writing a progress report of the audit that was unfavorable, albeit honest and accurate.

76.     Finally, in July 2018, Ms. Kaur expressed interest in participating in a series of internal telephone conferences that Mr. Boeri had scheduled regarding various audit, training, and staff development-related topics, all of which would be relevant to developing Ms. Kaur's skills in Group Audit and bridging any purported knowledge gap.

77.     Although Ms. Kaur's participation would simply involve calling in to a telephone conference, and would in no way be disruptive or inappropriate, Mr. Boeri denied Ms. Kaur's request to participate, thereby denying her the opportunity to improve upon her audit skills and further marginalizing her by preventing her from meaningfully interacting with the Group Audit team.

78.     Through the foregoing actions, Mr. Boeri disingenuously and dishonestly manufactured a non-existent deficiency in Ms. Kaur's performance and subsequently denied Ms. Kaur of any meaningful opportunity to attempt to rectify any such fictional deficiency.

79.     Put simply, after Ms. Kaur disclosed a serious medical condition and took a medical leave, Mr. Boeri actively discriminated and retaliated against her by taking steps to ensure her failure in Group Audit.

**Ms. Kaur Raises Complaints Concerning Discriminatory Conduct**

80.     In addition to retaliating and discriminating against Ms. Kaur on the basis of her disability (or perceived disability) and for having taken medical leave, Ms. Kaur was also retaliated against for raising concerns about discrimination towards other minority employees on the basis of their ethnicity, national origin and/or race.

81.     In April 2018, Group Audit offered a mandatory day-and-a-half long training course presented by a third-party vendor, which Ms. Kaur's colleague was responsible for coordinating and organizing.

82.     In offering lectures and case studies on topics including fraud, bribery, corruption and money laundering, the training course painted South Asians, such as Ms. Kaur and other participants, as being prone to engage in fraudulent activities related to terrorism.

83.     Indeed, multiple individuals of Pakistani and Indian descent complained to Ms. Kaur and her colleagues that the presentation perpetuated racist and inappropriate stereotypes.

84.     To that end, on the second day of the training, Ms. Kaur's colleague, Ather Khan, approached Ms. Kaur on his own and told Ms. Kaur that he was extremely uncomfortable by the case studies being used because one of the character's name was Saba Khan, and was repeatedly referred to merely as "Mr. Khan."

85.     Ather Khan told Ms. Kaur that he did not feel comfortable even going to the restroom because of "how it would look."

86.     In an April 25, 2018 email to Mr. Boeri, Ms. Kaur complained about the content and subject matter of the presentation, stating that she wanted to make him "aware of a situation that [she felt] could have been very much prevented, but unfortunately, was not."

87.     Ms. Kaur further told Mr. Boeri that she would "like to discuss the insensitivity and continuous perpetuation that occurred" in their one-on-one meeting scheduled for the following day.

88.     Ms. Kaur also raised this complaint with Mr. Overton, forwarding the email she had sent to Mr. Boeri to Mr. Overton as well, and informing Mr. Overton that she would like to discuss her complaint with him.  Mr. Overton suggested that they speak after Ms. Kaur spoke with Mr. Boeri.

89.     On April 26, 2018, Ms. Kaur raised her concerns to Mr. Boeri in their one-on-one meeting, but Mr. Boeri failed to appreciate the severity of the complaints.

90.     Instead, Mr. Boeri became enraged that Ms. Kaur had also sent her complaint to Mr. Overton.

91.     Mr. Boeri further baselessly and inappropriately accused Ms. Kaur of soliciting and inciting outrage among South Asian employees.

92.     Mr. Boeri further told Ms. Kaur that she was not permitted to talk to senior management and that if she had a problem, she should go to HR.

93.     On May 2, 2018, Ms. Kaur complained to Ms. Stoltz via email regarding the hostility of the work environment including Mr. Boeri's response to her complaints.

94.     Ms. Kaur wrote that she had "raised an issue with training [with Mr. Boeri] regarding a specific case study perpetuating racial stereotypes," and that Mr. Boeri "became loud and aggressive with [her] when [they] discussed the case study in [their] 1:1."

95.     Ms. Kaur further wrote that she felt "that this is in retaliation and [she was] in a hostile work environment."

96.     Ms. Kaur informed Ms. Stoltz that "[t]his [was] not the first time that this aggressiveness has occurred and [she was] concerned."

97.     On May 7, 2018, Ms. Kaur met with Ms. Stoltz and complained in person regarding the hostility of the work environment, Mr. Boeri's failure to provide her opportunities to succeed following her return from medical leave, and Mr. Boeri's response to her complaints.

98.     Specifically, Ms. Kaur informed Ms. Stoltz that, upon returning from medical leave and her complaining about Mr. Boeri's discriminatory conduct, Mr. Boeri had stripped her of various responsibilities and deliverables.

99.     Ms. Kaur further complained that, although she continued to repeatedly request opportunities to take courses and exams in an effort to improve upon her audit skills, she was denied any meaningful opportunity for growth or to bridge the previously identified "knowledge gap."

100.    On May 24, 2018, Ms. Kaur met with HR's Joanna Smith, at which time she raised similar complaints as those that she had raised in her May 7, 2018 meeting with Ms. Stoltz.

101.    On July 18, 2018, Ms. Kaur requested that Ms. Smith provide her with an update of the investigation, noting that it had been approximately three months since her initial complaint and that her situation had not improved.

102.    Ms. Smith informed Ms. Kaur that she was continuing to look into Ms. Kaur's complaint and invited Ms. Kaur to share any additional details or facts.

103.    On September 19, 2018 — approximately four months after Ms. Kaur's initial complaint — Ms. Smith and Christina Berti, in-house counsel for Deutsche Bank, informed Ms. Kaur that they had completed their investigation, but that the results were "inconclusive."  Ms. Smith and Ms. Berti told Ms. Kaur that there was nothing further that they could do in response to her complaints about Mr. Boeri's discriminatory and retaliatory conduct.

104.    At the September 19, 2018 meeting, Ms. Kaur informed Ms. Smith and Ms. Berti that, despite the Bank's conclusion, she was still being forced to endure a hostile work environment and that Mr. Boeri had continued to retaliate against her, including that Mr. Boeri had denied her request to take the Certified Internal Auditor training exam.

105.    On September 21, 2018, Ms. Kaur sent an email to Ms. Smith and Ms. Berti in which she wrote, "As I have been with the bank for 8 years, I want to know what are the next steps as my situation in [Group Audit] is still quite uncomfortable and I feel that I am in a hostile work environment."

106.    Ms. Smith did not offer any meaningful guidance in response, and instead merely informed Ms. Kaur that HR had "conducted a very thorough investigation of all [her] allegations" and invited her to share other instances of discrimination and/or retaliation to the extent they existed.

107.    Notably, although Ms. Smith informed Ms. Kaur that she would look into Mr. Boeri's most recent denial of Ms. Kaur's request to take the Certified Internal Auditor training exam, Ms. Smith never contacted Ms. Kaur further regarding this complaint.

108.    Rather, on October 22, 2018 — merely weeks after Ms. Kaur's most recent complaint — Ms. Kaur was called into a meeting with Mr. Boeri and Ms. Stoltz, at which time Mr. Boeri informed Ms. Kaur that she was being fired.

109.    In terminating Ms. Kaur's employment, Mr. Boeri merely stated "this isn't working out," while also citing alleged "integrity issues."

110.    On October 31, 2018, Ms. Kaur requested that Ms. Stoltz send her the formal reason for her termination.

111.    On November 5, 2018, Ms. Stoltz wrote, "[Mr. Boeri] communicated to you in the Summer of 2017 that he did not believe you had the appropriate skillset for your position and provided similar feedback in 2018 as well.  In addition to that, there were concerns around your performance and conduct related issues."

112.    Notably, as previously discussed, despite Ms. Kaur's requests that definitive performance objectives be set for 2018, Mr. Boeri did not give Ms. Kaur a year-end review in 2017, which resulted in uncertainty in her objectives and expectations in 2018.

113.    As further discussed above, Ms. Kaur had been a long term employee who received constant praise until Mr. Boeri's clear campaign against her, and any purported "conduct related issues" were pretextual fabrications.

114.    Likewise, Mr. Boeri's bad-faith belief that Ms. Kaur lacked the "appropriate skillset" for her position was only perpetuated and exacerbated by the fact that he denied Ms. Kaur of any meaningful opportunity to familiarize herself with audit-related topics and develop the skills necessary to succeed.

115.    In reality, it is readily apparent that any purported issues Mr. Boeri had with Ms. Kaur's skillset or supposed "integrity issues" stemmed from his discriminatory animus towards her and the fact that she filed complaints of discrimination against him.

116.    Upon terminating Ms. Kaur's employment, and despite her eight years of loyal service to the Bank, Deutsche Bank did not offer her any form of severance.

117.    However, through February 2019, Deutsche Bank continued to send Ms. Kaur open positions within the Bank on a weekly basis.

118.    Clearly, if the Bank genuinely believed that Ms. Kaur displayed "integrity" and "conduct-related issues" sufficient to warrant her abrupt termination, it would not continue to offer her opportunities for continued employment.

119.    Furthermore, despite Mr. Boeri's promise that the Bank would pay Ms. Kaur for 20 unused vacation days that she had accrued, the Bank has failed to do so.

**Defendants have Discriminated Against Other Minority Employees**

120.    While Ms. Kaur's termination was plainly retaliatory, it also demonstrated a pattern of national origin, ethnicity and color discrimination present at Deutsche Bank.

121.    To that end, prior to going on medical leave in July 2017, Ms. Kaur was one of three minority employees, out of approximately six total employees on the Staff Development Team, who reported to Mr. Boeri.

122.    However, upon information and belief, while Ms. Kaur was on medical leave, Mr. Boeri forced the other two minority employees — an Asian woman named Amelia Wong and a Black man named Ron Iton — off of the Staff Development Team.

123.    As with Ms. Kaur, both Ms. Wong and Mr. Iton were pushed out on the purported basis of being a "mismatch" with the group.

19

124.    However, contrary to Mr. Boeri's purported basis for terminating Ms. Wong and Mr. Iton, both Ms. Wong and Mr. Iton both had backgrounds in audit and were not mismatches for Group Audit.

125.    Upon information and belief, Mr. Boeri replaced Mr. Iton with a White woman, and, although Ms. Wong's position remained open for several months, she was also replaced by a White woman who began in November 2018.

126.    Indeed, after pushing Mr. Iton and Ms. Wong out of Group Audit, Mr. Boeri hired additional White employees such that Ms. Kaur was the last remaining minority employee of the now approximately ten employees reporting to Mr. Boeri.

127.    Moreover, Ms. Kaur is aware of other minority employees in Group Audit who have been denied any form of severance despite the Bank's documented severance policy providing for two weeks of severance pay for every year of service.

### FIRST CAUSE OF ACTION
**(Retaliation in Violation of the FMLA)**
***Against All Defendants***

128.    Plaintiff repeats, reiterates and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

129.    At all times relevant herein, Plaintiff was an "eligible employee" within the meaning of the FMLA.  Plaintiff, a full-time employee of Deutsche Bank, at all relevant times worked at least 1,250 hours in any 12-month period, and specifically, in the 12-month period preceding her termination.

130.    At all times relevant herein, Deutsche Bank was a "covered employer" within the meaning of the FMLA.  Deutsche Bank employs 50 or more employees in at least 20 calendar weeks within a 75 mile radius of the Bank.

131.    By the actions described above, among others, Defendants have retaliated against Ms. Kaur for taking FMLA leave by stripping her of her responsibilities and obligations in her job, denying her the opportunity to succeed in her position at the Bank and ultimately terminating her employment shortly after she returned from medical leave.

132.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the FMLA, Plaintiff has suffered, and continues to suffer, monetary and/or other economic harm for which she is entitled to an award of monetary damages and other relief.

133.    As a direct and proximate result of Deutsche Bank's unlawful conduct in violation of the FMLA, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, for which she is entitled to an award of damages, to the greatest extent permitted under law, in addition to reasonable attorneys' fees and expenses.

## SECOND CAUSE OF ACTION
**(Discrimination in Violation of the NYSHRL)**
*Against All Defendants*

134.    Plaintiff repeats, reiterates and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

135.    By the actions described above, among others, Defendants have discriminated against Plaintiff on the basis of her disability and/or perceived disability, national origin, ethnicity and/or color in violation of the NYSHRL by denying her equal terms and conditions of employment, including, but not limited to, denying her the opportunity to work in an employment setting free of unlawful discrimination, denying or taking away her job responsibilities and advancement opportunities and ultimately terminating her employment.

136.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or

economic harm for which she is entitled to an award of damages, to the greatest extent permitted under law, in addition to reasonable attorneys' fees and expenses.

137.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, for which she is entitled to an award of monetary damages and other relief.

<u>**THIRD CAUSE OF ACTION**</u>
**(Retaliation in Violation of the NYSHRL)**
***Against All Defendants***

138.    Plaintiff repeats, reiterates and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

139.    Defendants retaliated against Plaintiff by, among other things, subjecting her to a hostile work environment and ultimately terminating her employment after she complained about discriminatory conduct.

140.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, harm for which she is entitled to an award of damages, to the greatest extent permitted under law, in addition to reasonable attorneys' fees and expenses.

141.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, for which she is entitled to an award of damages, to the greatest extent permitted under law, in addition to reasonable attorneys' fees and expenses.

## FOURTH CAUSE OF ACTION
### (Discrimination in Violation of the NYCHRL)
### *Against All Defendants*

142.     Plaintiff repeats, reiterates and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

143.     By the actions described above, among others, Defendants have discriminated against Plaintiff on the basis of her disability and/or perceived disability, national origin, ethnicity and/or color in violation of the NYCHRL by denying her equal terms and conditions of employment, including, but not limited to, denying her the opportunity to work in an employment setting free of unlawful discrimination, denying or taking away her job responsibilities and advancement opportunities and ultimately terminating her employment.

144.     As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of damages, to the greatest extent permitted under law, in addition to reasonable attorneys' fees and expenses.

145.     As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, for which she is entitled to an award of monetary damages and other relief.

146.     Deutsche Bank's unlawful and discriminatory actions constitute malicious, willful and wanton violations of the NYCHRL for which Plaintiff is entitled to an award of punitive damages.

## FIFTH CAUSE OF ACTION
### (Retaliation in Violation of the NYCHRL)
#### *Against All Defendants*

147.     Plaintiff repeats, reiterates and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

148.     Defendants retaliated against Plaintiff by, among other things, subjecting her to a hostile work environment and ultimately terminating her employment after she complained about discriminatory conduct.

149.     As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, harm for which she is entitled to an award of damages, to the greatest extent permitted under law, in addition to reasonable attorneys' fees and expenses.

150.     As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, for which she is entitled to an award of damages, to the greatest extent permitted under law, in addition to reasonable attorneys' fees and expenses.

151.     Deutsche Bank's unlawful and retaliatory actions constitute malicious, willful and wanton violations of the NYCHRL for which Plaintiff is entitled to an award of punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court enter judgment in her favor and against Defendants, through the following relief:

A.     A declaratory judgment that the actions, conduct and practices of Defendants complained of herein violate the laws of the United States and the State of New York;

B.     An injunction and order permanently restraining Defendants from engaging in such unlawful conduct;

C.     An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic damages;

D.     An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for harm to her professional and personal reputations and loss of career fulfillment;

E.     An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all non-monetary and/or compensatory damages, including but not limited to, emotional pain and suffering and emotional distress;

F.     An award of punitive damages in an amount to be determined at trial;

G.     An award of attorneys' fees and costs that Plaintiff has incurred in this action to the fullest extent permitted by law; and

H.     Such other and further relief as the Court may deem just and proper.

## <u>JURY DEMAND</u>

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: March 21, 2019
New York, New York

Respectfully submitted,

**WIGDOR LLP**

By: _____
      David E. Gottlieb
      Kenneth D. Walsh

85 Fifth Avenue
New York, NY 10003
Telephone: (212) 257-6800
Facsimile: (212) 257-6845
dgottlieb@wigdorlaw.com
kwalsh@wigdorlaw.com

*Attorneys for Plaintiff*